# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **KEVIN J. ASHLIN,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:08CV00001 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | By: James P. Jones |
| **COMMISSIONER OF** | ) | Chief United States District Judge |
| **SOCIAL SECURITY**, | ) | |
| | ) | |
| Defendant. | ) | |

*Vernon M. Williams, Wolfe, Williams, Rutherford & Feynolds, Norton, Virginia, for Plaintiff; Andrew C. Lynch, Special Assistant United States Attorney, Office of the General Counsel, Social Security Administration, Philadelphia, Pennsylvania, for Defendant.*

In this social security case, I affirm the final decision of the Commissioner.

## I

Kevin J. Ashlin filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") denying his claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") pursuant to Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C.A. §§ 401-433, 1381-1383 (West 2003 & Supp. 2008). Jurisdiction of this court exists pursuant to 42 U.S.C.A. § 405(g).

My review under the Act is limited to a determination as to whether there is substantial evidence to support the Commissioner's final decision. If substantial evidence exists, the court's "inquiry must terminate," and the final decision of the Commissioner must be affirmed. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotations omitted). It is not the role of this court to substitute its judgment for that of the Commissioner, as long as substantial evidence provides a basis for the Commissioner's decisions. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

The plaintiff protectively filed for DIB and SSI on October 16, 2003, alleging disability beginning May 3, 2003, due to a variety of neurological ailments that resulted from a ladder fall, including: brain and nerve damage; headaches; lack of a sense of smell and taste; dizzy spells; blurred vision; buzzing and scratching sounds in his head; tingling in arms, hands, and legs; concentration and memory problems; and a popping sensation in his ears. (R. at 238.)

This claim was denied initially on March 25, 2004 (R. at 119-22), and upon reconsideration on August 26, 2004. (R. at 126-28.) At his request, the plaintiff received a hearing before an administrative law judge ("ALJ") on November 15,

2005. (R. at 47-72.) To afford the plaintiff a consultative psychological examination, the ALJ continued the hearing until March 7, 2006. (R. at 69.) At that time, a vocational expert and the plaintiff, who was represented by counsel, testified. (*Id*.) By decision dated May 24, 2006, the ALJ denied the plaintiff's claim for DIB and SSI. (R. at 33.)

The plaintiff filed a request for review of the ALJ's decision with the Social Security Administration's Appeals Council ("Appeals Council"), but was denied on November 8, 2007. (R. at 9.) Thus, the ALJ's opinion dated May 24, 2006, constituted the final decision of the Commissioner. The plaintiff then filed his Complaint with this court on January 4, 2008, objecting to the final decision of the Commissioner.

The parties have filed cross motions for summary judgment and have briefed the issues. The case is now ripe for decision.

## II

The summary judgment record reveals the following facts. The plaintiff was thirty-seven years old when the ALJ made his decision, making him a younger individual under the Commissioner's Regulations. *See* 20 C.F.R. § 404.1563(c) (2008). He is a high school graduate and has held jobs as an assembler, cashier,

- 3 -

salesman, and as an independent landscaper. (R. at 88-89, 250.) He claims disability due to a variety of neurological problems. (R. at 238.)

Those problems arose after he fell ten feet from a ladder. After the accident, he was admitted to Roanoke Memorial Hospital from May 3, 2003 to May 9, 2003, where he underwent a number of tests. He reported losing consciousness after the fall, difficulty remembering events surrounding the accident, and a headache. (R. at 343.) A computer topography (CT) scan showed traumatic subarachnoid hemorrhage and cerebral contusion. (*Id.*) Dr. Van Laney Lewis reported interval clearing of most of the subarachnoid blood in the right slyvian fissure, a small focal hemorrhage on the right frontemoporal area, and a small cortical hemorrhage in the left frontal opercular region. (R. at 329.) Dr. Michael D. Hollander reported that there was no evidence of an aneurysm or stenosis. (R. at 325.) Dr. Amanda Chisum-Price reported that the plaintiff was discharged with a prescription for Lortab and instructed him not to drive, and stated that he was unable to work until May 18, 2003. (R. at 324.)

Another CT scan showed a minimal nonspecific deep left frontal white matter focus. (R. at 319.) On October 28, 2003, the plaintiff complained of dizziness in the emergency room at Roanoke Memorial Hospital. (R. at 301.) He received a prescription for Valium, was instructed to schedule follow-up appointments, and told not to drive. (R. at 304.)

- 4 -

On May 28, 2003, the plaintiff saw Dr. Raymond Harron and had complained of post-concussive symptoms, but informed Dr. Harron that he had returned to work. (R. at 347.) In July, 2003, Dr. Harron reviewed the plaintiff's latest CT scan and reported that "he [was] doing well," despite non-specific deep frontal white matter changes. (R. at 345.) In September, 2004, Dr. Harron evaluated a MRI scan with the plaintiff, which revealed a small disc protrusion on the right at the C5-C6 level. (R. at 591.) At this visit, the plaintiff complained of neck pain, bilateral shoulder pain and arm pain. (*Id.*) Dr. Harron explained that a Cardiolite stress ruled out the heart as a source of these symptoms. (*Id.*) Dr. Harron did not recommend surgery, but instead suggested physical therapy. (*Id.*) During an appointment with the plaintiff in December, 2004, Dr. Harron reviewed a magnetic resonance imagery (MRI) of the cervical spine, which demonstrated a very small osteophytic complex at the C5-C6 level. (R. at 653.) He suggested that the plaintiff participate in a sleep clinic, and scheduled him for an MRI of the brain with and without contrast, an electroencephalogram (EEG), and a nerve conduction study of both upper extremities. (*Id.*)

The plaintiff saw Dr. Aaron J. Prussin for his ear problems. Dr. Prussin prescribed Nasacort and Vitamin A, and scheduled the plaintiff for a CT scan of his sinuses. (R. at 364.) The CT scan showed two foci of mucosal membrane thickening

- 5 -

in the right maxillary sinus. (R. at 366.) Dr. Prussin considered placing tubes in the plaintiff's ears, but remained uncertain whether that would alleviate the symptoms. (R. at 492-95, 709-10.) At one point, the plaintiff told Dr. Prussin that he was feeling "OK" since Dr. Zedalis had prescribed him Klonopin. (R. at 707.)

Dr. Prussin referred the plaintiff to Dr. Robert T. Jackson for further neurological consultation. Dr. Jackson agreed that he suffered an intracranial hemorrhage, but noted that two EEGs were normal. (R. at 438-40.)

Dr. Lawrence Teruel examined the plaintiff's ears and jaw. (R. at 357.) The plaintiff complained of popping sensations and symptoms associated with TMJ. (*Id.*) Dr. Teurel advised him to see an oral surgeon, and discussed potential surgery in which tubes would be inserted. (R. at 358.) On July 30, 2003, Dr. Teurel inserted tubes into both ears, although he warned that the procedure would not alleviate the symptoms associated with TMJ. (R. at 355.) During a follow-up appointment on August 7, 2003, Dr. Teurel commented that "his complaints [were] out of proportion to clinical findings." (R. at 353.) Dr. Teruel advised the plaintiff to keep his ear dry and to undergo a CT scan for evidence of temporal bone injury. (R. at 352-53.)

The plaintiff visited Carilion New River Valley Medical Center often. An MRI of the plaintiff's brain on November 11, 2003 was unremarkable, as was the MRI on December 29, 2004, and an activated EEG was normal. (R. at 371-72.) On January

25, 2005, the plaintiff visited the emergency room and complained of pain in his arms, legs, back, neck, and eyes. The attending physician ordered an MRI of his lumbar spine, which was unremarkable. (R. at 672-73.) An MRI of the cervical spine on May 17, 2005 showed small posterior osteophytes at the C5-C6 level and mild bulging of the disk. (R. at 675.)

The plaintiff spent two days in Wythe County Community Hospital for hematemesis of an undetermined etiology. (R. at 375.) X rays exhibited no acute chest or abdomen abnormalities. (R. at 377.) He was discharged with prescriptions for Prilosec, Monpril, and Hydrochlorothiazide. (*Id.*) After experiencing a car accident in 2005, an X ray showed a normal cervical spine. (R. at 667.) The plaintiff visited the hospital again on September 9, 2005, complaining of numbness in his arms and face, but X rays showed "no abnormalities . . . which would account for [his] symptoms." (R. at 695.)

Dr. Wayne D. Horney saw the plaintiff for a number of complaints, including headaches, blurry vision, throat pain, back pain, jaw pain, dizzy spells, hypertension, nausea, depression, anxiety, fatigue, arm pain, and sleep difficulty. (R. at 378, 380, 382, 385, 388, 580.) On a Certificate of Health for the Virginia Employment Commission, Dr. Horney stated that the plaintiff was "totally unable to work" between May 3, 2003 and December 8, 2003. (R. at 589.)

- 7 -

Dr. Horney referred the plaintiff to Cardiovascular Associates, P.C. for his hypertension and chest pains. After initial examination, Dr. Furrukh S. Malik recommended a stress test, which returned normal results. (R. at 521, 523.)

The plaintiff saw Dr. W. David Kiser for eye discomfort. Dr. Kiser determined that except for some pupillary abnormalities, an exam of the plaintiff's eyes was normal. (R. at 442.)

Dr. Ivan Login from the University of Virginia examined the plaintiff upon the request of Dr. Jackson. He recommended neuropsych testing, but found nothing wrong with his vision. (R. at 451.) He also questioned whether he dissected his left vertebral, but even that would not require further treatment. (*Id.*) A later MRI showed bifrontal encephalmalacia, small foci of white matter in both frontal lobes, but no evidence of arterial dissection. (R. 679-80.) He reviewed a collection of CT scans and an EEG and informed the plaintiff "that there [was] nothing to worry about" and that the bleeding that occurred after his injury had cleared. (R. at 756.)

On February 16, 2004, Dr. Joy O'Grady, Ph.D., a postdoctoral fellow in neuropsychology at the University of Virginia, evaluated the plaintiff and analyzed a number of test results conducted during the meeting. (R. at 605-08.) Dr. O'Grady characterized his symptoms as "impaired attention," and recommended that he consult a psychiatrist or psychotherapist, return to work part-time and eventually full-time,

- 8 -

maintain regular sleep habits, avoid alcohol, minimize stress, and use "memory compensatory strategies."  (R. at 608.)

Dr. Richard M. Surrosco, a state agency physician, conducted a Physical Residual Functional Capacity (RFC) assessment based on the plaintiff's medical records and found that although the plaintiff's claims in regard to his closed head injury were credible, his comments in regard to his inability to work were not.  (R. at 502.)  He opined that the plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, sit, stand, or walk for approximately six hours in an eight-hour workday, and had unlimited push and pulling capacity.  (R. at 498.)

Dr. R.J. Milan, Ph.D, a state agency psychologist, completed a Psychiatric Review Technique form based on the plaintiff's medical records.  He found that the plaintiff had mild restrictions on his daily living activities and mild difficulties in maintaining social functioning, but moderate difficulties in maintaining concentration, persistence, or pace.  (R. at 514.)  Dr. Milan also completed a Mental RFC assessment.   He found that the plaintiff could understand and remember instructions, establish a work routine, interact socially, and adapt to changes in the workplace.  (R. at 520.)  Though the plaintiff was limited by occasional disruptions in concentration and attention, he would nonetheless be able "to meet the basic demands of competitive work."  (*Id.*)

- 9 -

Amanda Brewer-Smith, O.D., examined the plaintiff's eyes. She initially reported vitreous floaters and had administered Pilocarpine, but later concluded that there was no ocular etiology. (R. at 475, 706.)

The plaintiff saw Dr. Rollin James Hawley for a neurologic consultation. He stated that the plaintiff had a normal neurologic examination, though an EEG of his left upper extremity showed a chronic left C7 Cervical Radiculopathy. (R. at 638.) Dr. Hawley gave the plaintiff a booklet about conservative neck care and advised him to focus on treating his depression. (*Id.*)

Dr. Donald Zedalis saw the plaintiff for sleep problems. During his initial visit, Dr. Zedalis diagnosed him with atypical and recurrent dreams, sleep onset and sleep maintenance insomnia, REM Behavior Disorder, and anxiety. (R. at 647.) Dr. Zedalis prescribed him Klonopin. (*Id.*) Approximately two months later, Dr. Zedalis reported that the plaintiff's "insomnia has markedly improved" and that his "condition is quite well controlled on medications." (R. at 687.)

Elaine Harper, a nurse practitioner, studied the plaintiff's medical records, recorded his complaints, and concluded that the plaintiff's ability to deal with work stress, to maintain attention, to concentrate, and to understand and implement complex or detailed work instructions was poor. (R. at 717-18.)

- 10 -

Dr. Vani R. Chilukuri evaluated the plaintiff. He opined that the plaintiff has a postconcussive syndrome, and that treating his depression and anxiety would alleviate most of his other symptoms. He recommended anti-depressant medication and Neurotonin. (R. at 755.)

Dr. Gregory A. Helm opined that a CT/Myelogram showed no evidence of nerve root compression, and that an EEG showed nothing more than an old C7 radiculopathy. (R. at 721.) During the plaintiff's initial visit, Dr. Helm commented that "[h]is MRI scan looks quite good" and prescribed physical therapy. (R. at 722.)

Robert C. Miller, Ed.D., evaluated the plaintiff and Dr. O'Grady's report and concluded that he was suffering from pain disorder associated with both psychological factors and a general medical condition, major depressive disorder, and generalized anxiety disorder. (R. at 750.) He opined that the plaintiff would be unable to follow work rules, relate to coworkers, deal with the public, interact with supervisors, deal with work stresses, maintain attention and concentration, adjust to complex or detailed job instructions, behave in an emotionally stable manner, relate predictably in social situations, or demonstrate reliability. (R. at 745-46.)

The evidence in this case also includes the plaintiff's testimony regarding his subjective claims and his activities of daily living. He related impaired concentration, eye pain, neck pain, impaired memory, headaches, sleep problems, dizziness, lack of

- 11 -

smell or taste, arm pain, and depression. (R. at 78-79, 81-86.) He explained that he landscapes and pressure washes homes during the summer months, checks email, hunts deer, cleans the dishes and house, and feeds his dogs and cats. (R. at 88-89, 92-93, 96, 98.)

Following the plaintiff's testimony, a vocational expert testified regarding the plaintiff's past work experience. The vocational expert classified the plaintiff's past positions in assembling, as a cashier, truck driver, and landscaper as unskilled or semi-skilled, ranging from light to heavy exertion levels. (R. at 106-07.)

The ALJ then asked the vocational expert about jobs available for a hypothetical individual of the same age, experience, background and RFC as the plaintiff. The ALJ described the RFC as a range of light work, excluding the operation of dangerous moving machinery and unprotected heights, and with no limits on the ability to push or pull. (R. at 107-08.) The vocational expert stated that the plaintiff could be hired in assembly and as a cashier, but not as a delivery route driver or landscaper. (R. at 108-09.) He continued to explain that such an individual could find work as a general office clerk, domestic cleaner, or as a laundry worker. He stated that there were 329,280 general office clerk jobs nationally and 15,680 regionally; 294,000 domestic cleaner jobs nationally and 19,461 regionally; and 91,140 laundry worker jobs nationally and 5,488 regionally. (R. at 109.) The

- 12 -

vocational expert opined that the plaintiff could perform these jobs even with nonexertional mental limitations. (R. at 109-10.)

The ALJ then asked the vocational expert about jobs available for a hypothetical individual of the same age, experience, and background as the plaintiff, but with a RFC range of less than sedentary work. (R. at 110-11.) The vocational expert stated that the plaintiff could be hired as a security monitor or an order clerk. (R. at 111-12.) With added nonexertional mental limitations, the plaintiff would not be able to find substantial gainful activity. (R. at 112.)

The ALJ also asked the vocational expert whether that hypothetical individual could perform these jobs if his pain required him to take three or four unscheduled breaks during the week to lay down. (R. at 112-13.) The vocational expert opined that an individual with that limitation would not be able to keep any of the jobs he had previously mentioned unless the employer made special accommodations. (R. at 113.)

The plaintiff's attorney asked the vocational expert whether an employee who needed extra time to complete assignments, who requested that instructions be repeated, who asked for flexibility, and who required a ten-minute break every thirty minutes would survive in a normal work setting. (R. at 114.) The vocational expert

- 13 -

opined that such an employee would not progress beyond a probationary work period. (R. at 114-115.)

## III

The plaintiff bears the burden of proving that he is under a disability. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). The standard for disability is strict. The plaintiff must show that his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C.A. § 423.

The Commissioner applies a five-step sequential evaluation process in assessing DIB and SSI claims. The Commissioner considers whether the claimant: (1) has worked during the alleged period of disability; (2) has a severe impairment; (3) has a condition that meets or equals the severity of a listed impairment; (4) could return to his past relevant work; and (5) if not, whether he could perform other work present in the national economy. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). If it is determined at any point in the five-step analysis that the claimant is not disabled, then the inquiry immediately ceases. *See id.*; *Bowen v. Yuckert*, 482 U.S.

137, 141-42 (1987). The fourth and fifth steps in this inquiry require an assessment of the claimant's RFC, which is then compared with the physical and mental demands of the claimant's past relevant work and of other work present in the national economy. *See* 20 C.F.R. §§ 404.1560(b)-(c), 416.960(b)-(c).

My review is limited to a determination of whether there is substantial evidence to support the Commissioner's final decision and whether the correct legal standard has been applied. 42 U.S.C.A. § 405(g); *see Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). If substantial evidence exists, the final decision of the Commissioner must be affirmed. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (internal quotations omitted). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws*, 368 F.2d at 642. It is the role of the ALJ to resolve evidentiary conflicts, including inconsistences in the evidence. It is not the role of this court to substitute its judgment for that of the Commissioner, as long as substantial evidence provides a basis for the Commissioner's decisions. *See Hays*, 907 F.2d at 1456.

The plaintiff contends that the ALJ failed to properly consider the opinion evidence of both his physical and mental limitations. In regard to his physical limitations, the plaintiff argues that the ALJ afforded insufficient weight to the

- 15 -

opinions of Dr. O'Grady, Dr. Miller, and Harper, and relied too heavily on the opinions of Dr. Surrosco and Dr. Milan. In regard to his mental limitations, the plaintiff maintains that the ALJ should have attributed greater weight to the opinions of Dr. Horney and Harper. I disagree.

Dr. O'Grady opined that the plaintiff suffered from "impaired attention." (R. at 608.) In giving it some weight, the ALJ incorporated Dr. O'Grady's diagnosis into his RFC assessment, stating that the claimant's ability to maintain attention would occasionally be disrupted and "affect his ability to understand, remember, and carryout detailed job instructions." (R. at 29.) However, the ALJ concluded that the plaintiff could return to work full-time, whereas Dr. O'Grady opined that he initially return only on a part-time basis. (R. at 608.)

The ALJ attributed great weight to the opinions of Dr. Surrosco and Dr. Milan. (R. at 30.) Dr. Surrosco reported that the plaintiff's comments in regard to his inability to work were not credible. (R. at 502.) Dr. Milan opined that the plaintiff would be able "to meet the basic demands of competitive work." (R. at 520.)

Both Dr. Miller's opinion and Harper's opinion received little weight. (R. at 30.) Dr. Miller concluded that the plaintiff suffered from pain disorder associated with both psychological factors and a general medical condition, major depressive disorder, and generalized anxiety disorder. (R. at 750.) Harper determined that the

- 16 -

plaintiff's ability to deal with work stress, to maintain attention, to concentrate, and to understand and implement complex or detailed work instructions was poor. (R. at 717-18.)

I find that the ALJ weighed the opinion evidence of the plaintiff's mental limitations consistent with his responsibility.

Even assuming that Dr. O'Grady and Dr. Miller qualify as treating physicians, they do not deserve controlling weight. The opinion of a treating physician controls only when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record . . . ." 20 C.F.R. § 404.1527(d)(2). Because other substantial evidence conflicts with the opinions of Dr. O'Grady and Dr. Miller, they do not deserve controlling weight.

For example, only three-and-a-half months after the plaintiff's accident Dr. Harron commented that "he [was] doing quite well," despite non-specific deep frontal white matter changes. (R. at 345.) In fact, on May 28, 2003, Dr. Harron reported that the plaintiff had returned to work. (R. at 347.) Dr. Jackson examined the plaintiff's neurological status and concluded that two EEGs had returned normal results. (R. at 438-40.) In 2003 and 2004, two MRIs of the plaintiff's brain were unremarkable. (R. at 371-72.) Dr. Login reviewed scans of the plaintiff's brain and an EEG and told

- 17 -

him "that there [was] nothing to worry about . . . ."  (R. at 756.)  Dr. Hawley stated that the plaintiff's neurological examination was normal.  (R. at 638. )  Dr. Chilukuri explained that the plaintiff had a postconcussive syndrome, but that treating his depression and anxiety would alleviate most of his other symptoms.  (R. at 755.)

The plaintiff testified that he had landscaped and pressure washed homes during summer months, checked email, hunted deer, cleaned dishes and his house, and fed his pets.  (R. at 88-89, 92-93, 96, 98.)  As the ALJ explained, these activities "demonstrate the [plaintiff's] ability to maintain attention and concentration for at least simple tasks, to successfully interact with others, and to perform physical activities at the light exertional level on a consistent basis."  (R. at 30.)

This objective evidence also supports Dr. Surrosco's opinion that the plaintiff's claims lacked credibility and Dr. Milan's opinion that the plaintiff could survive in the workplace.  (R. at 502, 520.)  "As with the record of an examining physician, the Commissioner accords the opinions of state agency physicians weight consistent with the objective medical evidence underlying their opinions."  *Agee v. Barnhart*, Mp/ 6:04CV00032, 2005 WL 878098, at *5 (W.D. Va. April 14, 2005) (citing 20 C.F.R. § 416.927(a)-(e)).

Though Dr. Surrosco and Dr. Milan assessed the plaintiff's condition on August 19, 2004, before the record in this case was complete, no evidence received

- 18 -

after that date contradicts their conclusions, other than Dr. Miller's opinion and Harper's opinion. As the evidence described above demonstrates, the opinions of both Dr. Miller and Harper are inconsistent with substantial evidence. Furthermore, Harper had relied heavily on the claimant's report of limitations rather than independent medical evidence. (R. at 30-31.). *See* 20 C.F.R. § 404.1527(d)(3) (stating that "[t]he more a medical source presents relevant evidence [for] support . . ., the more weight we will give that opinion"). Therefore, the ALJ did not err in relying heavily on the opinions of Dr. Surrosco and Dr. Milan, and affording only little weight to the opinions of Dr. Miller and Harper.

Accordingly, my review of the record finds substantial evidence to support the manner in which the ALJ considered the opinion evidence of the plaintiff's mental limitations.

I also find that the ALJ properly treated the opinion evidence of the plaintiff's physical limitations.

The plaintiff argues that the ALJ should have attributed more weight to Dr. Horney's statements on a Certificate of Health form for the Virginia Employment Commission, in which Dr. Horney claimed that the plaintiff suffered from dizziness, visual impairments, and intermittent numbness, and that the plaintiff was unable to work for a period of seven months. (R. at 314.) I disagree.

- 19 -

Those statements have no affect here, since any disability determination made by another governmental agency does not bind the Commissioner. *See* 20 C.F.R. § 404.1504. And even if they did, they would not deserve controlling weight since they are inconsistent with substantial evidence. *See* 20 C.F.R. § 404.1527(d)(2).

For instance, though the plaintiff visited a hospital for numbness in his arms and face, X rays demonstrated "no abnormalities . . . which would account for [his] symptoms." (R. at 695.) Dr. Kiser's exam of the plaintiff's eyes was normal, except for some pupil abnormalities. (R. at 442.) Dr. Login found nothing wrong with his vision. (R. at 451.) And there is no evidence to explain the plaintiff's dizziness. In short, as the independent medical expert confirmed at the hearing, the plaintiff "had no medically determinable physical impairment documented in the file that [could] account for his symptoms." (R. at 68.)

The plaintiff also contends that more weight should have been applied to Harper's RFC assessment, which is more limited than the one determined by the ALJ. Again, I disagree.

In her RFC assessment, Harper assumed that the plaintiff had impaired vision and borderline hearing loss. (R. at 715-16). Again, Harper's opinion conflicts with substantial evidence in the record. Both Dr. Kiser and Dr. Login found no medical reason for the plaintiff's visual symptoms, and Dr. Teurel commented that the

- 20 -

plaintiff's ear complaints were "out of proportion to clinical findings." (R. at 352.) The plaintiff regularly checked email and hunted deer, activities inconsistent with impaired vision and hearing. Substantial evidence supported the ALJ's decision to give Harper's opinion little weight.

Accordingly, I find that substantial evidence supports the weight given to the opinion evidence by the ALJ in regard to both the plaintiff's physical and mental limitations.[1]

## V

For the foregoing reasons, the plaintiff's Motion for Summary Judgment will be denied, and the Commissioner's Motion for Summary Judgment will be granted. An appropriate final judgment will be entered affirming the Commissioner's final decision denying benefits.

DATED: March 2, 2009

/s/ JAMES P. JONES
Chief United States District Judge

---

[1] The plaintiff also argues that because the opinion evidence was improperly weighed, the ALJ erred in determining the plaintiff's RFC. Because I find that the ALJ properly weighed the opinion evidence, this argument fails.

- 21 -